UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BILLIE JO STEINHART,

                            Plaintiff,             **MEMORANDUM AND ORDER**

        -against-                                      11-CV-22 (SLT)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                            Defendant.
-------------------------------------------------------------x

**TOWNES, United States District Judge:**

      Billie Jo Steinhart ("Plaintiff"), seeks review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's application for Supplemental Security Income benefits ("SSI") and disability insurance benefits ("DIB"). (A.R. at 113, 117.) The parties have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, the Commissioner's motion is denied, and Plaintiff's motion is granted to the extent it seeks remand, and the action is remanded to the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual and Medical Background Before the ALJ

      Plaintiff was born on November 20, 1967. (Administrative Record ("A.R.") at 113.) Throughout the period of 1994 until 1997, Plaintiff worked sporadically as a home health aide, at some points earning no money or only a few hundred dollars. (A.R. at 30-31, 131.) In addition, for one month during the summer of 1998, Plaintiff worked as a ride operator at an amusement park and, at some point prior to that, for a community board answering phones and handling filing and faxes. (A.R. at 39.) Notwithstanding these periods of intermittent employment, Plaintiff testified that she had been on public assistance since she turned 18 years old, and had

not looked for work because "the only work [she] know[s] how to do is home attendant and operating rides." (A.R. at 39.)

In her disability report filed with the Social Security Administration in February of 2008, Plaintiff indicated that she suffers from a variety of medical conditions, including depression, anxiety, heart disease, diabetes, and pain and weakness in her hands, legs, back, and shoulder. (A.R. at 130.) Plaintiff takes a variety of prescription medications for these various ailments. (A.R. at 145.) As a result of Plaintiff's conditions, she has difficulty walking for long periods of time, cannot lift or carry heavy items, has difficulty breathing and maintaining focus, and is limited in her daily life to activities such as cleaning or cooking. (A.R. at 130.) Because of these conditions, Plaintiff stopped working on January 1, 1997. (A.R. at 130.) On February 22, 2008, Plaintiff filed her applications for SSI and DIB. (A.R. at 113-18.)

In a function report Plaintiff filed with the New York State Office of Temporary and Disability Assistance Division of Disability Determinations in March of 2008, Plaintiff indicated that as a result of her medical condition, she requires help getting dressed, brushing her hair, cleaning the house, cooking, and driving. (A.R. at 155-56.) Plaintiff also indicated that she is unable to handle her own financial matters because she becomes "confused and forget[s] what [she is] doing." (A.R. at 157.) And, while Plaintiff enjoys watching television or listening to the radio, she is unable to sit or stand for long periods of time. (A.R. at 157.) Other than a monthly outing to go shopping in stores, Plaintiff does not go outside except to attend appointments with her doctor or therapist. (A.R. at 157, 158.)

Notwithstanding the voluminous medical record in this case, which contains documents roughly covering a time period that spans from January of 2007 to July of 2008, there are no records from any of Plaintiff's appointments with Dr. Erica Cardona, M.D., who, according to Plaintiff, became her treating physician in August of 2008. Indeed, despite Plaintiff's testimony that, as of August of 2008, she had been seeing Cardona at least once a month – and sometimes every two weeks -- the administrative record contains none of Cardona's treatment

or progress notes, and, with a few exceptions described below, no medical records at all from this period of time more immediately preceding the June 9, 2009 hearing. (A.R. at 43-44.)

The record does contain two reports from Cardona dated April 29, 2009. In the first report, Cardona indicates that Plaintiff is in need of a motorized scooter due to the fact that a cane or walker would not meet her mobility needs. (A.R. at 715.) The report further indicates that a manual wheelchair would be similarly insufficient because of her chronic obstructive pulmonary disease ("COPD") and the pain she experiences in her extremities. (A.R. at 715.) Finally, Cardona's report indicates that Plaintiff requires an elevating leg rest either because she has a "cast, brace, or condition that prevents 90 degree flexion of the knee" or because she suffers from "significant lower extremity edema that requires elevation." (A.R. at 715.) Cardona's second report prescribes a seat lift mechanism for Plaintiff due to her severe arthritis in her hip or knee. (A.R. at 716.)

The only other medical documents in the administrative record for the period of time that Plaintiff was seeing Cardona for treatment pertain to Plaintiff's September 16, 2008 visit to the emergency room at Brookdale Hospital. The documentation from that visit indicates that Plaintiff was admitted to the emergency room due to swelling, pain, and numbness in her right leg. (A.R. at 1004, 1012.) The same day that she was admitted, Plaintiff was observed to be "sitting up on the stretcher without complaints." (A.R. at 1013.) On Plaintiff's ER Patient Facesheet, it indicates that Plaintiff was admitted to "Medicine," and reported to have "acute [right lower extremity] Venous Thrombosis" and "chronic [left lower extremity] DVT."[1] (A.R. at 1012.) By September 18, 2008, Plaintiff's swelling had decreased and she denied pain. (A.R. at 1037-38.) At the time of her discharge from the emergency room, Plaintiff was prescribed a series of medication and advised to see her primary physician in three days to adjust the doses

---

[1] Venous Thrombosis, DVT, or deep vein thrombosis, "is a condition in which a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs. Deep vein thrombosis can cause leg pain, but often occurs without any symptoms." *Mayo Clinic*, Definitions, Deep Vein Thrombosis ("DVT"), http://www.mayoclinic.com/health/deep-vein-thrombosis/DS01005 (last visited October 2, 2013).

of the prescription medication. (A.R. at 1003.) Plaintiff was also educated regarding monitoring her international normalized ration ("INR") for anticoagulant monitoring and giving self-injections of Lovenox to prevent blood clots. (A.R. at 1003.) She was released in "stable" condition. (A.R. at 1004.)

B. <u>The June 9, 2009 Hearing</u>

On June 9, 2009, the ALJ held a hearing on Plaintiff's application for benefits. (A.R. at 16.) Plaintiff was represented by Pauline Asemota, a non-attorney, non-paralegal representative who had been referred to Plaintiff by an organization that had helped Plaintiff prepare her application for benefits. (A.R. at 25-26.) At the hearing, Asemota informed the ALJ that, although she had reviewed Plaintiff's record, she did not intend to ask Plaintiff any questions and had no theory as to why Plaintiff should be granted disability benefits. (A.R. at 25-26.) As a result, the ALJ, dissatisfied with the quality of Asemota's representation, twice attempted to persuade Plaintiff to seek alternative counsel from a list of organizations that provide free legal representation to individuals seeking to obtain social security benefits. (A.R. at 25-29, 31-38.) After an exchange between Plaintiff, Asemota, and the ALJ, during which Plaintiff became very upset, Plaintiff indicated that, despite having only met Asemota that morning, she trusted her, and wished to proceed with the hearing because she could not afford to keep coming back and forth for hearing dates. (A.R. at 30-37.) At Plaintiff's insistence, the ALJ proceeded with the hearing. (A.R. at 37.) Asemota did not ask Plaintiff any questions.

At the hearing, the ALJ indicated that this was Plaintiff's fourth application for benefits, although this was her first hearing. (A.R. at 22-23.) Plaintiff testified that despite the fact that the previous decisions denying her applications informed her of her right to appeal and request a hearing, she did not pay attention to that language and so had never before requested a hearing. (A.R. at 24.)

In response to the ALJ's questions, Plaintiff testified that she had been unable to work because of her illness, which she said causes her to forget things. (A.R. at 39.) The ALJ also

4

questioned Plaintiff regarding her past drug abuse. Plaintiff testified that she had used crack cocaine and would receive it for free in exchange for telling others where they could find it and who they should buy it from. (A.R. at 41.) Moreover, although the precise circumstances are somewhat unclear, Plaintiff testified that she was arrested in June or July of 2008 for accepting money from an undercover police officer ostensibly in exchange for drugs. Plaintiff testified, however, that she was released the next day and ultimately charged with a misdemeanor because "there was no evidence that [she] had any drugs on [her]." (A.R. at 41-43.)

As described, Plaintiff also testified that she was seeing Dr. Cardona on a regular basis for treatment for her pain and to receive "prescriptions and [her] medications." (A.R. at 44.) In regards to her mental health issues, Plaintiff indicated that she was "still in search of a doctor for the psych medication." (A.R. at 44.) The last time Plaintiff received treatment for her mental health issues was when she was involved in a program at Coney Island Hospital from April of 2008 until June of 2008, during which time she met with a counselor named John and a therapist, Dr. Lee. (A.R. at 44-45.) Plaintiff indicated that she saw John every day to help her with her drug problem. (A.R. at 45-46.) Plaintiff also testified that she smokes about one pack of cigarettes every two days and that Cardona has advised her to quit, but that smoking is "the only thing that relaxes [her] nerves." (A.R. at 46.)

As to the limitations caused by her medical problems, Plaintiff testified that her friend, Curvey Littlejohn, who also testified at the hearing, helps her with her shopping, cooking and cleaning, and that Cardona and Littlejohn are in the process of "trying to get [her] a home attendant for [ ] four hours a day because [she is] not able to go outside" due to the stairs in front of the house. (A.R. at 46-47.) Plaintiff indicated that as a result of blood clots in her legs and poor circulation, she is scheduled for an additional surgery to place a filter in her main artery in her right leg. (A.R. at 48.) She also elaborated on Cardona's prescription for a seat mechanism, explaining that the mechanism is "a reclining chair that helps you stand up because I have problems with my legs. I get cramps pretty much every night in my legs. My legs stiffen

up and I can't move and it hurts. And when I do walk, I can walk maybe give or take maybe a half a block and my legs lock up. I can't walk." (A.R. at 48.)

In addition to Plaintiff, Littlejohn testified as a witness. Littlejohn opined that Plaintiff is "not a well person," and confirmed that she was awaiting surgery to place a filter in her right leg. He also indicated that Plaintiff was due to undergo a hernia operation. (A.R. at 51.) Littlejohn testified that Cardona was waiting for certain test results before moving ahead with the surgeries and he believed she "wanted to wait for [Plaintiff] to have the hernia operation first." (A.R. at 52.) No vocational expert testified at the hearing.

C. The ALJ's Decision

On June 30, 2009, the ALJ issued her decision, denying Plaintiff's application for benefits. (A.R. at 15.) The ALJ determined that Plaintiff suffered from several severe impairments, including obesity, hypertension, diabetes mellitus with neuropathy, asthma, cocaine dependence and abuse in remission by history, and a depressive disorder, but concluded that Plaintiff did not have an impairment or combination of impairments that rendered her disabled under the social security regulations. (A.R. at 10.)

In assessing Plaintiff's residual functional capacity ("RFC"), the ALJ concluded that Plaintiff was capable of performing a broad range of light work, subject to certain limitations. (A.R. at 10.) In making this determination, the ALJ found that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but found Plaintiff's testimony regarding the intensity, persistence, and limiting effects of these symptoms not credible "in light of the medical evidence, which has not identified an impairment of severity." (A.R. at 12.) The ALJ also declined to credit Plaintiff's testimony because she lied to at least one doctor about whether she had used drugs at all and because of certain inconsistencies in the record regarding when she had last used drugs. (*See* A.R. at 13.) The ALJ does not appear to have made any credibility determination regarding Littlejohn.

6

The ALJ did consider Plaintiff's medical records, including the two documents provided by Plaintiff's treating physician, Dr. Cardona. The ALJ noted that Cardona's report regarding Plaintiff's use of a motorized scooter indicates that Plaintiff suffers from COPD and dizziness, but appears not to have credited that report because "there is no evidence in [the] file that would show that [Plaintiff] has any respiratory disorder other than the mild asthma that appears elsewhere in the medical evidence." (A.R. at 13.) Rather, although the ALJ did not specify what weight she was assigning to particular physicians' opinions, she appears to have relied on the June 17, 2008 opinion of Dr. Rahel Eyassu, a state consultant physician, who indicated that Plaintiff suffers "mild to moderate limitations [due to her physical problems], consistent with a restriction to light work." (A.R. at 13.) As to Plaintiff's mental health issues, the ALJ relied on medical reports from 2007 indicating that such issues could be resolved in one to three months, caused little or no restrictions in Plaintiff's performance of activities of daily living, and caused only few problems in the area of socialization (A.R. at 13.) The ALJ also appears to have accorded weight to psychiatric reports from as late as June of 2008, indicating that Plaintiff's mental health issues caused only moderate symptoms. (A.R. at 13.)

Upon determining that Plaintiff could perform light work, subject to specific limitations, the ALJ concluded that Plaintiff had no past relevant work. (A.R. at 13.) Nonetheless, the ALJ concluded that because Plaintiff's limitations "have not significantly eroded the occupational base of light and sedentary work that she could perform," there are "a substantial number of jobs in the national economy that [she] would be able to perform." (A.R. at 14.) The ALJ accordingly found that Plaintiff was not disabled under the Social Security Act.

In a letter dated July 24, 2009 Plaintiff, represented by counsel, requested that the Appeals Council review the ALJ's decision. (A.R. at 55-57.) On December 14, 2010, the Appeals Council denied Plaintiff's request for review, having "found no reason under our rules to

review the [ALJ's] decision."[2] (A.R. at 1.) On January 4, 2011, Plaintiff filed the instant complaint seeking review of the ALJ's decision.

## II. LEGAL STANDARDS

A. Standard of Review

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision ... in the district court of the United States for the judicial district in which the plaintiff resides." Upon this review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). "Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera*

---

[2] The court notes that in its December 14, 2010 decision, the Appeals Council refers to an additional claim filed by Plaintiff on or about July 27, 2009. (A.R. at 1.) However, the Appeals Council explicitly stated that it would address that claim in a separate decision and that claim in no way forms part of Plaintiff's current appeal.

8

*v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y.1991). The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

Upon review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B. <u>The Required Procedure</u>

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step process set forth in 20 C.F.R. § 404.1520(a). However, the Social Security regulations also dictate what evidence the Commissioner must consider, and the manner in which the Commissioner must evaluate the evidence. First, the regulations require that, under some circumstances, deference be given to the opinions of those physicians who have personally treated social security claimants. The "treating physician rule" provides that a treating source's opinion regarding the nature and severity of a claimant's impairments that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record should be given controlling weight. 20 C.F.R. § 404.1527(c)(2). However, the "opinions of a treating physician . . . need not be given controlling weight where they are contradicted by other substantial evidence in the

9

record." *Veino*, 312 F.3d at 588 (citations omitted). The less consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

An ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions." *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (quoting *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978)). Yet, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) (*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000)). For that matter, an ALJ cannot set his own expertise against that of any physician who submitted an opinion to or testified before him or her. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2). In determining what weight to give to the treating physician's opinion, the ALJ is required to apply the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) any other significant factors. *See id.* After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Before an ALJ can weigh these factors, however, the ALJ must develop the record. *Burgess*, 537 F.3d at 129. Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw*, 221 F.3d at 131. "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without

first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). "[W]here . . . an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005). Moreover, "[a]n ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity." *Tirado v. Astrue*, 2012 WL 259914, at *4 (E.D.N.Y. Jan. 25, 2012) (citing *LoRusso v. Astrue*, 2010 WL 1292300, at *7 (E.D.N.Y. Mar. 31, 2010)).

### III. DISCUSSION

Plaintiff moves for judgment on the pleadings, arguing that remand is warranted because the ALJ failed to fully develop the record and because he accorded insufficient weight to the opinion of Dr. Cardona, her treating physician. The Commissioner, in turn, moves to affirm the ALJ's decision.

Prior to making any determination, the ALJ has a responsibility to "develop [the] complete medical history for at least the 12 months preceding the month in which" the application is filed and use "every reasonable effort" to help a claimant obtain this information. 20 C.F.R. § 416.912(d). The "complete medical history" of a claimant includes "the records of [the claimant's] medical source(s) covering at least the 12 months preceding the month in which [the claimant] file[s] [an] application." 20 C.F.R. § 416.912(d)(2). In making "every reasonable effort" to obtain an applicant's complete medical history, the ALJ must make an initial request for evidence, and if the evidence is not received, make one follow up request. 20 C.F.R. § 416.912(d)(1).

In the instant case, the ALJ failed to fulfill her duty to develop the record and obtain Plaintiff's complete medical history. To be sure, the ALJ considered Cardona's reports

11

indicating that Plaintiff requires the use of a scooter and a seat lift mechanism due to her COPD, degenerative joint disease, diabetes/neuropathy, and severe arthritis in her hip and knees. (A.R. at 13, 715, 716.) As Plaintiff testified, however, Cardona had been treating Plaintiff "on a regular basis," seeing her "once every two weeks or once a month" since August of 2008. (A.R. at 43-44.) Notwithstanding the fact that the ALJ was therefore aware at the June 9, 2009 hearing that Plaintiff had an almost year-long treating relationship with Cardona, Cardona's treatment notes and records are entirely absent from the administrative record. It is well-established that "an ALJ has an affirmative duty to seek out information to fill any clear gaps in the administrative record, regardless of whether the claimant is represented by counsel." *Larkins v. Barnhart*, 2004 WL 48862, at *2 (2d Cir. Jan. 7, 2004). Here, however, the ALJ appears to have declined to credit Cardona's opinion because there was "no evidence in [the] file that would show that [Plaintiff] has any respiratory disorder other than the mild asthma that appears elsewhere in the medical evidence." (A.R. at 13.) Of course, had Cardona's reports been part of the file, the ALJ might have reached a different conclusion.

Cardona's notes and reports are rendered even more significant by the fact that the administrative record is entirely devoid of any information assessing Plaintiff's limitations during the period of time she was being treated by Cardona. Indeed, in light of Littlejohn's testimony regarding Plaintiff's upcoming surgeries – testimony that the ALJ did not address in her decision – Cardona's reports may well contain elucidating information regarding the status of Plaintiff's leg and back problems. (*See* A.R. at 51-52.) In any event, given that there is no indication in the record that the ALJ ever attempted to obtain Cardona's records, ever assisted Plaintiff in obtaining them, or ever advised Plaintiff that she ought to obtain them, coupled with a dearth of medical information regarding Plaintiff's condition during the period lasting from August of 2008 until the June 9, 2009 hearing, the court concludes that the ALJ failed to obtain Plaintiff's complete medical history and remands to provide the ALJ an opportunity to do so. *See Rodriguez v. Apfel,* 1997 WL 691428, at *5 (S.D.N.Y. Nov. 4, 1997) (remanding where ALJ

failed to assist claimant in "obtaining comprehensible records" in order to present a "cogent overview of his medical history.")

In addition, the ALJ failed to obtain Cardona's RFC assessment. The Second Circuit has found that when there are gaps in the record and an ALJ has only an incomplete medical history, the ALJ is required to seek additional information. *Cf. Rosa*, 168 F.3d 72, 79 n.5 (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information."). Indeed, even if the ALJ was in possession of Plaintiff's complete medical history, which she was not, courts have found that "'[a]djudicators are generally required to request that acceptable medical sources provide these statements [regarding what individuals can still do despite his or her impairments] with their medical reports.'" *Johnson v. Astrue*, 811 F. Supp. 2d 618, 630 (E.D.N.Y. 2011) (quoting *Robins v. Astrue*, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011)). The ALJ's failure to even seek such a medical evaluation from Cardona was therefore erroneous. *See Robins*, 2011 WL 2446371, at *3 (noting that the social security regulations provide that although a lack of a residual functional capacity assessment will not render a report incomplete, the Commissioner is nevertheless required to request one); *Johnson*, 811 F. Supp. 2d at 630 (concluding that the ALJ erred by failing to request the treating physician's residual functional capacity opinion even though the ALJ possessed the claimant's complete medical history). The court, therefore, additionally remands this case to the ALJ to attempt to obtain Cardona's RFC opinion and for an opportunity to reevaluate the disability claim in light of this evidence. *See Mallard v. Astrue*, 2012 WL 580529, at *3-4 (E.D.N.Y. Feb. 22, 2012) (remanding for further development of the record where the ALJ did not obtain RFC opinions from the plaintiff's treating physicians or urge the plaintiff to obtain them herself).

Because the ALJ did not have the benefit of Cardona's treatment notes and RFC assessment at the time of her decision, the court cannot address whether the ALJ accorded

Cardona's opinion appropriate weight. After obtaining the missing medical evidence, the ALJ will be in a better position to reassess the weight to afford the opinion of Plaintiff's treating physician.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for a judgment on the pleadings is DENIED, and Plaintiff's motion for judgment on the pleadings is GRANTED to the extent it seeks remand. The action is therefore remanded to the Commissioner for further proceedings consistent with this opinion. On remand, the Commissioner should fully develop the administrative record by obtaining Cardona's treatment notes and medical records pertaining to Plaintiff as well as her RFC assessment and reconsider the appropriate weight to accord Cardona's opinion in light of such new evidence.

SO ORDERED.

                                                  _____S/_____
                                                  SANDRA L. TOWNES
                                                  United States District Judge

Dated:               , 2013
Brooklyn, New York